STATE OF NEBRASKA, EX REL. BANKERS UNION OF THE
WORLD, V. E. M. SEARLE, JR., AUDITOR.

FILED OCTOBER 5, 1905.  No. 14,268.

1. **Insurance: LICENSE: DISCRETION OF AUDITOR.** The auditor is clothed
with a broad discretion in determining whether a fraternal bene-
ficial society has complied with the law and is entitled to a li-
cense to do business. It is a legal and not an arbitrary discre-
tion.

2. ———: **FUNDS.** The mortuary fund of a fraternal beneficial so-
ciety should be "kept separate and apart from the other funds of
such society." The auditor may require this to be done before
granting license to continue business.

3. ———: **LICENSE: DUTY OF AUDITOR.** Under the facts in this case, as
disclosed by the petition demurred to, it is held that the auditor
should have called the attention of the society to the irregulari-
ties practiced in regard to the preservation of the mortuary
fund, so as to allow the society to comply with the requirements
of the auditor in that regard, and, upon such compliance, should
not have refused a license because of such former irregularities.

ORIGINAL application for a writ of mandamus to compel
respondent to issue a license authorizing relator to trans-
act business. *Writ denied.*

*Weaver & Giller* and *Field, Ricketts & Ricketts,* for re-
lator.

*Norris Brown, Attorney General,* and *W. T. Thompson,*
contra.

SEDGWICK, J.

This was an original application in this court for a writ
of mandamus. The object of the proceeding was to com-
pel the auditor to issue a license to the relator, authorizing
it to transact business for the year commencing March 1,
1905. The relator is a fraternal beneficiary association,
and made its annual report pursuant to the provisions of
section 100, chapter 43, Compiled Statutes, 1903 (Ann. St.

6492), and, upon the auditor's refusing to issue a license, made a subsequent report. These two reports were set out in the petition and in the alternative writ, and in behalf of the auditor a general demurrer was filed to the petition. The demurrer having been overruled, the petition was amended by striking out the words "capriciously, wantonly and wilfully," and inserting the words "wrongfully and unlawfully," so that the allegation of the petition in that regard now is that the auditor wrongfully and unlawfully refused the license. After making this change in the petition, the demurrer was refiled, and the cause is now submitted upon the demurrer.

1. The first question presented upon the argument was whether the auditor has an absolute discretion in the matter of granting or refusing this license, or whether it is a legal discretion and must be based upon some reason derived from the statute. Authorities have been cited supporting the proposition that the discretion of the auditor is an arbitrary one. It seems that this is the law in some of the states, and in others a contrary rule obtains. We think that the question must be determined from a consideration of our statute. The language of section 100 is: "If, upon examination, the auditor is satisfied that such society is transacting its business according to law and in no sense fraudulently, he shall issue his certificate authorizing it to transact business for the following year." If this were the only provision of statute throwing any light upon the question, it might be difficult of solution, but section 98 provides: "All such societies organized under the laws of this or any other state, territory or province, and now doing business in this state, may continue such business provided they hereafter comply with the provisions of this act," and section 106 provides that "the auditor of public accounts must, within sixty days after the failure to make such report, or in case any such society shall exceed its powers, or shall conduct its business fraudulently, or shall fail to comply with any of the provisions of this act, give notice in writing to the attorney general, who shall im-

mediately commence an action against such society to enjoin the same from carrying on any business," so that the auditor is expressly prohibited from annulling a license when he has issued it, which would appear to be inconsistent with that large absolute and personal power over these corporations which is involved in the idea that he may refuse a license without having just cause so to do. We conclude, unhesitatingly, that it is not the policy of our statute to clothe the auditor with such unlimited powers.

2. The question next arising is whether under the circumstances of this case it was the duty of the auditor to issue the license to this relator. This question is to be resolved from the petition itself. Attached to the petition and made a part thereof is the first report of the relator to the auditor, above referred to, also the correspondence of the auditor in which he refused to grant the license, and a copy of a statement of the relator furnishing additional information requested by the auditor, and also a copy of a second corrected report. Was it the duty of the auditor, if not satisfied that the relator was entitled to the license, to inform the relator of the ground of his objection, and give the relator an opportunity to comply with the law and obtain the license? As we have seen, the statute provided that, if companies organized and doing business at the time of the enactment of the statute should thereafter comply with the law, they should be allowed to continue in business. It is insisted, and to our minds with apparent reason, that a proper understanding of the various provisions of the statute would lead to the conclusion that it was the intention of the legislature that companies of this class, that had been licensed and were allowed to do business for a term of years, should be permitted to continue their business under the same restrictions imposed upon companies that had been organized before this provision of the statute was enacted. It may be that a corporation of this nature might be guilty of such gross misconduct and fraud, and the fact of its guilt be so palpable and indefensible, as to justify the auditor in peremptorily

refusing to issue a license to such company upon any conditions whatever. This question we do not find it necessary now to determine or discuss. We prefer rather to consider the particular violations of law which it is insisted are disclosed by this petition.

3. The first reason assigned for the refusal of the license is that "nearly $2,000 of these trust funds had disappeared in a single year, and no account made of any return." In answer to this charge it is pointed out by the relator that the first report shows two items of $1,250 and $750, repectively, owing by the relator to a certain company, and also shows two notes of the same company held by the relator, amounting to $2,000, and the amended report shows $2,000 of the assets of the company "charged off" because the mutual claims of these two parties had in the meantime been adjusted, and canceled each other.

4. The first report was filed with the auditor February 28, 1905, and the second report on the 15th day of April, the same year. In the meantime the company had been required to deposit the sum of $304.92 as additional security upon a supersedeas bond. A change in the report in that amount was apparently intended to explain this transaction, but it is urged against the relator as an arbitrary attempt to account for a discrepancy in its accounts.

5. It is suggested in the brief that the first report gives the losses adjusted during the year at $5,960, and the second report at $8,716.76, an increase of $2,756.76. The explanation made is that in the statement of losses adjusted in the first report the amounts were given as adjusted and allowed by the officers of the company, and that, subsequently, settlements of these claims were made upon compromise or judgment, and larger amounts were allowed. Without going into the details of this item, it is sufficient to say that there is nothing in the report, as made, from which it could be found that the officers of the company had intended to deceive the authorities of the state upon this point or that their action in connection with it was fraudulent.

6. In like manner it is suggested that the first report gives the losses not adjusted at $5,536.23, the second report at $6,113.90, an increase of $577.67. Of course, a statement of losses not adjusted would not be expected to show with exactness in all cases the amount that might afterwards be required to adjust the loss, and it is urged in explanation of this point that some of the claims listed in the first report as not adjusted were in fact afterwards adjusted at a larger amount, and in making the second report, which was supposed to show correctly the amount of the claims that were in process of adjustment on the 31st day of December, 1904, these claims were stated at the amount that was finally found to be the company's liability thereon. Whether the second report should have stated the amount which the company's liability on these claims was supposed on the 31st day of December to be, or should have stated the amount which it was afterwards discovered the company was actually liable thereon, it does not appear from the petition that it was attempted by the relator to deceive the authorities or to practice any fraud in this regard.

7. There are several other supposed discrepancies pointed out in the two reports of a similar nature to those above mentioned, and, without taking time to go into details in regard to these items, it is sufficient to say that the explanations offered, arising from the facts disclosed in the reports themselves, sufficiently answer the suggestion that these discrepancies show a violation of law, or an intention to deceive the authorities, or to conduct the business of the company fraudulently.

8. The reports contain statements of "claims upon which proofs had not been received December 31, 1904," and it is objected that the amount of these claims is not included in the statement of the liabilities of the relator. It may be that we do not correctly apprehend the position of the respondent upon this point, but as the claims appear, as far as we have discovered, to be described in the reports, if a better method of tabulating them, or if they should

have been included in general statements of the liabilities of the company, it would seem that attention should have been called to such defects, as they could have been easily corrected.

9. There is one matter to which attention is called in this connection that appears to be of a more serious nature. Section 111 provides: "The moneys collected by any such society from its members, according to the plan or method provided in its constitution and by-laws for the payment of death or disability claims arising under the terms of 's beneficiary certificates shall be kept separate and apart from the other funds of such society, and shall be used only in payment of such claims, and no part thereof shall be used by such society in payment of expenses of any kind or character." It was pointed out upon the argument that these reports show a deficiency in the mortuary fund of the society amounting to between $4,000 and $5,000. It is attempted to explain this deficiency by the suggestion that moneys belonging to this fund have been by the company advanced to its agents in the nature of loans, upon the understanding and agreement that the amount shall be deducted from moneys that may afterwards become due to the agents from the company, and the reports appear to show that money has been loaned during the year to agents and others more than sufficient to account for this deficiency in the mortuary fund. It is suggested also that "loans of relator's funds have been made during each year of its business existence in exactly the same way and for similar purposes as was done by the board of directors of said relator in 1904. Such loans have always been regarded as good ones by the insurance department and allowed as a proper asset, and relator's renewal of license has always been issued it from year to year without questioning the character of said loans, always including them in relator's assets." The brief then gives a detailed statement of these loans for each year during the existence of this company. These matters do not appear in the petition demurred to, and, if they did, it would not follow that

the auditor should continue to approve a practice which in his judgment was improper. It seems to us that the statute above quoted, as well as the general policy of the law as disclosed in the entire act, amply justifies the auditor in concluding to disapprove of such practice. It would seem that the mortuary fund should be "kept separate and apart from the other funds of such society," and if notes, bonds or securities were taken or held by the society for the mortuary funds loaned, the papers themselves should be deposited with or exhibited to the auditor, which would enable him to ascertain whether such loans were made upon sufficient securities. If the practice described in the brief has been indulged in by this society ever since it was organized, and such practice has been from year to year approved by the auditor, the most that can be urged from this would be that the auditor should have called the attention of the society's officers to his determination to change this practice, and give the society an opportunity to make such change, before refusing to issue the license to continue in business. The question as presented by this demurrer is not free from difficulties, but we have concluded that the matters shown in the petition demurred to are sufficient to entitle the relator to an opportunity to change its practice in this regard. It follows that the auditor, before refusing the license, should have pointed out this objection to the relator, and, upon satisfactory showing that the mortuary fund would be properly protected and preserved, should not have refused a license upon this ground.

The prayer of the petition is: "Wherefore, by reason of the premises, relator moves the court for a writ of mandamus directing defendant to issue to relator his certificate authorizing relator to transact its business in the state of Nebraska for the year 1905," and the command of the alternative writ is in substance the same. With the view that we take of the practice of this company in regard to the mortuary fund, we think that the discretion with which the law has clothed the auditor in that regard ought not to be ignored, and that the relator is not entitled to the re-

lief as prayed for in this application. It does not appear that the auditor has wilfully disregarded his duty toward this relator, and it will not be presumed that a peremptory writ will be necessary. The denial of the writ will, of course, be without prejudice to a new action when conditions are changed. The writ will be denied, without costs.

WRIT DENIED.